**IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF MISSOURI**

**IN RE:**

| | | |
|---|---|---|
| **SOUTHWEST MISSOURI BANK** **MOVANT** | ) | |
| | ) | **CHAPTER 7** |
| **vs.** | ) | |
| | ) | **CASE NO. 10-30394-7** |
| **KAY LYNN CLAYTON** | ) | |
| **RESPONDENT** | ) | |
| **PATRICIA ANN BROWN** **TRUSTEE** | ) | |

**MOTION FOR RELIEF FROM AUTOMATIC STAY AND FOR ABANDONMENT**

COMES NOW Southwest Missouri Bank, (hereinafter "Movant"), and moves the Court to enter an Order granting Movant Relief From The Automatic Stay provisions of 11 U.S.C. § 362(a) of the Bankruptcy Code and For Abandonment pursuant to §554(b) of the Bankruptcy Code and in support thereof would show unto this Court the following:

1. Movant holds a valid lien on the property of the Debtor located at 1080 W. Fountain Road, Joplin, Missouri 64801. Said collateral is secured by a Note dated October 27, 2004 in the original principal amount of $250,000.00. A copy of the properly recorded Deed of Trust which includes the description of the subject property is attached hereto as Exhibit "A"; and a copy of the Note is attached hereto as Exhibit "B".

2. The Debtor is in arrears for payments on said Note. The total amount due to Movant is approximately $216,070.48 and the value of the property is $190,000.00. A copy of the appraisal by Janelle L Choens is attached hereto as Exhibit "C".

3. That since Debtor has not made the Note payments as and when they have come due, and there is no equity for the benefit of the estate, good cause exists to lift the Automatic Stay and allow Movant to commence proceedings on said Note.

WHEREFORE, PREMISES CONSIDERED, Movant requests that the Trustee abandon the property from the estate pursuant to 11 U.S.C. § 554(b), that the Court lift the Automatic Stay provisions of 11 U.S.C. § 362(a) of the Bankruptcy Code, thereby allowing Movant to initiate collection of Note, and that the Court enter an order awarding Movant attorney's fees and court costs.

Respectfully submitted,

**SPENCER, SCOTT & DWYER, P.C.**

By______________________

Robert L. Gross #37087
US Bank Building, 6th Floor
402 Main
P.O. Box 278
Joplin, MO 64802-0278
(417) 623-6211
(417) 624-6981 Facsimile
***ATTORNEYS FOR SOUTHWEST MISSOURI BANK***

BK 1893 PG 1352

11/10/2004 3:24:58 PM

BOOK: 1893

PAGE: 1352-1360

04-25042

STATE OF MISSOURI
COUNTY OF JASPER
RECORDER'S CERTIFICATION

SEAL — RECORDER OF DEEDS, JASPER COUNTY, MISSOURI

Donna Grove

RECORDER OF DEEDS

State of Missouri ——— Space Above This Line For Recording Data ———

# REAL ESTATE DEED OF TRUST

(With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Deed of Trust (Security Instrument) is ............10-27-2004............ and the parties, their addresses and tax identification numbers, if required, are as follows:

GRANTOR: JACK M. CLAYTON AND KAY L. CLAYTON, AS HUSBAND AND WIFE
29114 FOREST LANE
CARL JUNCTION, MO 64834

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, 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

☐ If checked, refer to the attached Addendum incorporated herein, for additional Grantors, their signatures, addresses and acknowledgments. The Addendum is on page(s) ..........

TRUSTEE: JOHN J PODLESKI
341 S MAIN
CARTHAGE, MO 64836

LENDER/GRANTEE: SOUTHWEST MISSOURI BANK - NEOSHO NORTH
ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF MISSOURI
110 N NEOSHO BLVD.
NEOSHO, MO 64850

43-1161740

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Grantor's performance under this Security Instrument, Grantor irrevocably grants, bargains, sells and conveys to Trustee, in trust for the benefit of Lender, with power of sale, the following described property: (If the legal description of the Property is not on page one of this Security Instrument, it is on page(s) ..........)
SEE ATTACHED EXHIBIT 'A'

(3)





BK 1893 PG 1353

The property is located in .................................................................. (County) at 1080 FOUNTAIN ROAD ................................ (Address), JOPLIN (City), Missouri 64801 (ZIP Code)

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ 250,000.00 ................................ . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:

   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)*

   NOTE EXECUTED 10/27/04 BY JACK M & KAY L CLAYTON IN THE AMOUNT OF $250,000.00 TOGETHER WITH ANY RENEWALS, EXTENSIONS OR ADDITIONAL NOTES THAT MAY BE USED FROM TIME TO TIME.

   ☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

   ☐ **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

   B. All future advances from Lender to Grantor or other future obligations of Grantor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Grantor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Grantor, or any one or more Grantor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

   C. All obligations Grantor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Grantor and Lender.

   D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Grantor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Grantor warrants that Grantor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Grantor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Grantor agrees:

BK 1893 PG 1354

A. To make all payments when due and to perform or comply with all covenants.
B. To promptly deliver to Lender any notices that Grantor receives from the holder.
C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Grantor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Grantor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Grantor's payment. Grantor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Grantor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Grantor may have against parties who supply labor or materials to maintain or improve the Property.

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

10. **TRANSFER OF AN INTEREST IN THE GRANTOR.** If Grantor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if:
A. A beneficial interest in Grantor is sold or transferred.
B. There is a change in either the identity or number of members of a partnership or similar entity.
C. There is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

11. **ENTITY WARRANTIES AND REPRESENTATIONS.** If Grantor is an entity other than a natural person (such as a corporation or other organization), Grantor makes to Lender the following warranties and representations which shall continue as long as the Secured Debt remains outstanding:
A. Grantor is duly organized and validly existing in the Grantor's state of incorporation or organization. Grantor is in good standing in all states in which Grantor transacts business. Grantor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Grantor operates.
B. The execution, delivery and performance of this Security Instrument by Grantor and the obligation evidenced by the Secured Debt are within the power of Grantor, have been duly authorized, have received all necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.
C. Other than previously disclosed in writing to Lender, Grantor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Grantor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Secured Debt is satisfied.

12. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Grantor will keep the Property in good condition and make all repairs that are reasonably necessary. Grantor shall not commit or allow any waste, impairment, or deterioration of the Property. Grantor will keep the Property free of noxious weeds and grasses. Grantor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Grantor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Grantor will notify Lender of all demands, proceedings, claims, and actions against Grantor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Grantor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Grantor shall not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Grantor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Grantor will in no way rely on Lender's inspection.

BK 1893 PG 1355

13. **AUTHORITY TO PERFORM.** If Grantor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Grantor appoints Lender as attorney in fact to sign Grantor's name or pay any amount necessary for performance. Lender's right to perform for Grantor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.
14. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Grantor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Grantor will perform all of Grantor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.
15. **DEFAULT.** Grantor will be in default if any of the following occur:
    A. Any party obligated on the Secured Debt fails to make payment when due;
    B. A breach of any term or covenant in this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt;
    C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Grantor or any person or entity obligated on the Secured Debt;
    D. The death, dissolution, or insolvency of, appointment of a receiver for, or application of any debtor relief law to, Grantor or any other person or entity obligated on the Secured Debt;
    E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the value of the Property is impaired;
    F. A material adverse change in Grantor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or
    G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.
16. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Grantor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Grantor is in default.

    At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents, including without limitation, the power to sell the Property.

    If there is a default, Trustee shall, in addition to any other permitted remedy, at the request of the Lender, advertise and sell the Property as a whole or in separate parcels at public auction to the highest bidder for cash and convey absolute title free and clear of all right, title and interest of Grantor at such time and place as Trustee designates. Trustee shall give notice of sale including the time, terms and place of sale and a description of the Property to be sold as required by the applicable law in effect at the time of the proposed sale.

    Upon sale of the Property and to the extent not prohibited by law, Trustee shall make and deliver a deed to the Property sold which conveys absolute title to the purchaser, and after first paying all fees, charges and costs, shall pay to Lender all moneys advanced for repairs, taxes, insurance, liens, assessments and prior encumbrances and interest thereon, and the principal and interest on the Secured Debt, paying the surplus, if any, to Grantor. Lender may purchase the Property. The recitals in any deed of conveyance shall be prima facie evidence of the facts set forth therein.

    All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy on Grantor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

BK 1893 PG 1356

17. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Grantor agrees to pay all of Lender's expenses if Grantor breaches any covenant in this Security Instrument. Grantor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Grantor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Grantor agrees to pay for any recordation costs of such release.
18. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

    Grantor represents, warrants and agrees that:

    A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.
    B. Except as previously disclosed and acknowledged in writing to Lender, Grantor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.
    C. Grantor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Grantor will take all necessary remedial action in accordance with Environmental Law.
    D. Except as previously disclosed and acknowledged in writing to Lender, Grantor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Grantor or any tenant of any Environmental Law. Grantor will immediately notify Lender in writing as soon as Grantor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.
    E. Except as previously disclosed and acknowledged in writing to Lender, Grantor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law.
    F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.
    G. Grantor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.
    H. Grantor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Grantor and any tenant are in compliance with applicable Environmental Law.
    I. Upon Lender's request and at any time, Grantor agrees, at Grantor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Grantor's obligations under this section at Grantor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Grantor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Grantor will provide Lender with collateral of at least equal value to the Property secured by this Security Instrument without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

19. **CONDEMNATION.** Grantor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Grantor authorizes Lender to intervene in Grantor's name in any of the above described actions or claims. Grantor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

20. **INSURANCE.** Grantor agrees to maintain insurance as follows:

A. Grantor shall keep the Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding sentence can change during the term of the loan. The insurance carrier providing the insurance shall be chosen by Grantor subject to Lender's approval, which shall not be unreasonably withheld. If Grantor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Grantor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Grantor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Grantor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Grantor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of scheduled payment nor change the amount of any payments. Any excess will be paid to the Grantor. If the Property is acquired by Lender, Grantor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

B. Grantor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

C. Grantor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

21. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Grantor will not be required to pay to Lender funds for taxes and insurance in escrow.

22. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Grantor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Grantor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Grantor's obligations under this Security Instrument and Lender's lien status on the Property.

23. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Grantor signs this Security Instrument but does not sign an evidence of debt, Grantor does so only to mortgage Grantor's interest in the Property to secure payment of the Secured Debt and Grantor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Grantor, Grantor agrees to waive any rights that may prevent Lender from bringing any action or claim against Grantor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Grantor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Grantor's consent. Such a change will not release Grantor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Grantor and Lender.
24. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by Mo. Rev. Stat. § 443.055 and the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.
25. **SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee without any other formality than the designation in writing. The successor trustee, without conveyance of the Property, shall succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.
26. **LEASE OF THE PROPERTY.** Trustee hereby leases the Property to Grantor until this Security Instrument is either satisfied and released or until there is a default under the provisions of this Security Instrument. The Property is leased upon the following terms and conditions: Grantor, and every person claiming an interest in or possessing the property or any part of it, shall pay rent during the term of the lease for one cent per month, payable on demand, and without notice or demand shall and will surrender peaceable possession of the Property to Trustee upon default or to the purchaser of the Property at the foreclosure sale.
27. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one grantor will be deemed to be notice to all grantors.
28. **WAIVERS.** Except to the extent prohibited by law, Grantor waives all appraisement and homestead exemption rights relating to the Property.

**Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (Grantor) and us (Lender) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

SIGNATURES: By signing below, Grantor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Grantor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

Entity Name: ..............................................

JACK M. CLAYTON 11/1/04 (Date)

KAY L. CLAYTON 11/1/04 (Date)

.............................................. (Date)

.............................................. (Date)

BK 1893 PG 1359

**ACKNOWLEDGMENT:**

(Grantor Acknowledgment)

STATE OF MISSOURI ............ County OF Jasper ............ } ss.

On this 27TH day of OCTOBER, 2004, before me appeared JACK M. CLAYTON; KAY L. CLAYTON, AS HUSBAND AND WIFE

☒ to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

☐ to me personally known, who, being by me duly sworn did say that s/he is the ............ (Title(s)) of ............ (Name of Business or Entity) and that the seal affixed to foregoing instrument is the corporate seal of said corporation or association, and that said instrument was signed and sealed in behalf of said corporation or association by authority of its board of directors or trustees, and said ............ acknowledged said instrument to be the free act and deed of said corporation or association.

☐ to me personally known, who, being by me duly sworn did say that s/he is the ............ (Title(s)) of ............ (Name of Business or Entity) and that said instrument was signed and sealed in behalf of said corporation or association by authority of its board of directors or trustees, and said ............ acknowledged said instrument to be the free act and deed of said corporation or association and that said corporation or association has no corporate seal.

My commission expires: 8/15/06

(Seal)

Carolyn A. Comer
(Notary Public)

Carolyn A. Comer

CAROLYN A. COMER
Notary Public-Notary Seal
State of Missouri, Jasper County
My Commission Expires Aug. 15, 2006

BK 1893 PG 1360

Attached exhibit 'A'
Deed of Trust dated 10/27/04
Jack M Clayton & Kay L Clayton

TRACT 1: ALL OF THE WEST ONE-HALF OF THE EAST ONE-HALF OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 27, TOWNSHIP 28, RANGE 33, JASPER COUNTY, MISSOURI.

TRACT 2: COMMENCING AT THE NORTHEAST CORNER OF SECTION 24, TOWNSHIP 28, RANGE 34, JASPER COUNTY, MISSOURI, THENCE SOUTH 0 DEGREES, 17 MINUTES, 44 SECONDS WEST ALONG THE EAST LINE OF SAID SECTION 2320.10 FEET, THENCE WEST 572.00 FEET TO THE POINT OF BEGINNING, THENCE SOUTH 0 DEGREES, 17 MINUTES, 44 SECONDS WEST 482.30 FEET, THENCE WEST 286.0 FEET, THENCE NORTH 0 DEGREES, 17 MINUTES 44 SECONDS EAST 482.30 FEET, THENCE EAST 286.0 FEET TO THE POINT OF BEGINNING, EXCEPT ANY PART TAKEN OR DEEDED FOR ROAD RIGHT-OF-WAY AND BEING SUBJECT TO ALL EASEMENTS OF RECORD, IF ANY, ALSO EXCEPT THE NORTH 25.0 FEET THEREOF FOR ROAD PURPOSES, ALSO,
TOGETHER WITH AND SUBJECT TO A 50 FOOT ROAD EASEMENT DESCRIBED AS COMMENCING AT THE SOUTHEAST CORNER OF THE EAST HALF OF THE NORTHEAST QUARTER OF SECTION 24, TOWNSHIP 28, RANGE 34 IN JASPER COUNTY, MISSOURI, THENCE NORTH 0 DEGREES, 13 MINUTES, 30 SECONDS EAST ALONG THE EAST LINE OF SECTION 24, A DISTANCE OF 305 FEET TO THE POINT OF BEGINNING, THENCE NORTH 0 DEGREES, 13 MINUTES, 30 SECONDS EAST 50 FEET, THENCE SOUTH 89 DEGREES, 59 MINUTES WEST 858 FEET, THENCE SOUTH 0 DEGREES, 13 MINUTES, 30 SECONDS WEST 50 FEET, THENCE NORTH 80 DEGREES, 59 MINUTES EAST 858 FEET TO THE POINT OF BEGINNING.

TRACT 3: ALL OF THE NORTHWEST QUARTER (NW ¼) OF THE NORTHEAST QUARTER (NE ¼), EXCEPT 30 FEET OFF OF THE EAST SIDE FOR ROAD RIGHT-OF-WAY, IN SECTION 31, TOWNSHIP 28, RANGE 33, JASPER COUNTY, MISSOURI, THE GRANTORS HEREBY RESERVING ALL MINERAL RIGHTS AND THIS DEED CONVEYING ONLY THE SURFACE RIGHTS.

X [signature] Jack M Clayton    X [signature] Kay L Clayton

17.25
30.75
48 CK

HAWKINS

BRIDGE LOAN

L1001783

| BORROWER'S NAME AND ADDRESS | LENDER'S NAME AND ADDRESS | |
|---|---|---|
| JACK M. CLAYTON; KAY L. CLAYTON<br>29114 FOREST LANE<br>CARL JUNCTION, MO 64834 | SOUTHWEST MISSOURI BANK - NEOSHO NORTH<br>110 N NEOSHO BLVD.<br>NEOSHO, MO 64850 | Loan Number<br>Date 10-27-2004<br>Maturity Date 10-27-2005<br>Loan Amount $ 250,000.00<br>Renewal Of |
| "I" includes each borrower above, jointly and severally. | "You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of TWO HUNDRED FIFTY THOUSAND AND NO/100 Dollars $ 250,000.00

☒ **Single Advance:** I will receive all of this principal sum on 10-27-2004. No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On ______ I will receive the amount of $ ______ and future principal advances are contemplated.

**Conditions:** The conditions for future advances are ______

☐ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to all other conditions and expires on ______.

☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from 10-27-2004 at the rate of 6.000 % per year until 10-27-2005.

☐ **Variable Rate:** This rate may then change as stated below.

☐ **Index Rate:** The future rate will be ______ the following index rate: ______

☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.

☐ **Frequency and Timing:** The rate on this note may change as often as ______. A change in the interest rate will take effect ______.

☐ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than ______ % or less than ______ %. The rate may not change more than ______ % each ______.

**Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:

☐ The amount of each scheduled payment will change. ☐ The amount of the final payment will change.

☐ ______

**ACCRUAL METHOD:** Interest will be calculated on a PERIODIC basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:

☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).

☐ at a rate equal to ______

☒ **LATE CHARGE:** If a payment is made more than 15 days after it is due, I agree to pay a late charge of 5.000% OF THE PAYMENT AMOUNT.

☒ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are ☒ are not included in the principal amount above: SEE HUD STATEMENT.

**PAYMENTS:** I agree to pay this note as follows:

ON DEMAND, BUT IF NO DEMAND IS MADE THEN 11 MONTHLY INTEREST PAYMENTS RANGING FROM $1250.00 TO $1291.67 BEGINNING 11-27-2004 AND 1 PAYMENT OF $251,250.00 ON 10-27-2005.

☐ **Unpaid Interest:** If checked, then any accrued interest not paid when due (whether due by reason of a schedule of payments or due because of Lender's demand) will become part of the principal thereafter, and will bear interest at the interest rate in effect from time to time as provided for in this agreement.

**ADDITIONAL TERMS:**

☒ **SECURITY:** This note is separately secured by (describe separate document by type and date): DEED OF TRUST DTD 10/27/04 IN THE AMT $240,000.00 & SECURITY AGREEMENT DTD 10/27/04 EXECTUED BY JACK M & KAY L CLAYTON *$250,000.00

(This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.)

**PURPOSE:** The purpose of this loan is PURCHASE PRIMARY RESIDENCE.

**SIGNATURES:** I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGE 2). I have received a copy on today's date.

Signature for Lender

JEFF K MAXWELL, VICE PRESIDENT

JACK M. CLAYTON

KAY L. CLAYTON

UNIVERSAL NOTE

Experian ©1994, 1991 Bankers Systems, Inc., St. Cloud, MN Form UN-MO 3/7/2002



EXHIBIT

B.

**DEFINITIONS:** As used on page 1, "[x]" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW:** The law of the state of Missouri will govern this note. Any term of this note which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**COMMISSIONS OR OTHER REMUNERATION:** I understand and agree that any insurance premiums paid to insurance companies as part of this note will involve money retained by you or paid back to you as commissions or other remuneration.

In addition, I understand and agree that some other payments to third parties as part of this note may also involve money retained by you or paid back to you as commissions or other remuneration.

**PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST:** Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal advanced at that time. You and I may provide in this agreement for accrued interest not paid when due to be added to principal. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to here (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE:** The index will serve only as a device for setting the rate on this note. You do not guarantee by selecting this index, or the margin, that the rate on this note will be the same rate you charge on any other loans or class of loans to me or other borrowers.

**ACCRUAL METHOD:** The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year." If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS:** If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph below, or if we have agreed that accrued interest not paid when due may be added to principal.

**MULTIPLE ADVANCE LOANS:** If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf, charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**SET-OFF:** I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:

(1) any deposit account balance I have with you;

(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and

(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

**DEFAULT:** I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season if I am a producer of crops; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES:** If I am in default on this note you have, but are not limited to, the following remedies:

(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued charges).

(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.

(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.

(4) You may refuse to make advances to me or allow purchases on credit by me.

(5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER:** I give up my rights to require you to do certain things. I will not require you to:

(1) demand payment of amounts due (presentment);

(2) obtain official certification of nonpayment (protest); or

(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT:** I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION:** I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE:** Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

**COLLATERAL PROTECTION INSURANCE:** If insurance on collateral is required by my agreement with you and I do not provide evidence of the required coverage, you may purchase insurance at my expense to protect your interests in my collateral. This insurance may, but need not, protect my interests. The coverage that you purchase may not pay any claim that I make or any claim that is made against me in connection with the collateral. I may later cancel any insurance purchased by you, but only after providing evidence that I have obtained insurance as required by our agreement. If you purchase insurance for the collateral, I will be responsible for the costs of that insurance, including the insurance premium, interest and any other charges you may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to my total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance I may be able to obtain on my own.

**ORAL AGREEMENTS: Oral agreements or commitments to loan money, extend credit or to forebear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH: |
|---|---|---|---|---|---|---|---|
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |



# APPRAISAL OF REAL PROPERTY

**LOCATED AT:**
1080 W Fountain Rd
See Addendum
Joplin , MO 64801

**FOR:**
Southwest Missouri Bank
110 N. Neosho Blvd., P.O. Box430
Neosho, MO 64850

**AS OF:**
03/04/2010

**BY:**
Janelle L Choens



EXHIBIT
C.

tabbies

# SUMMARY OF SALIENT FEATURES

| | |
|---|---|
| Subject Address | 1080 W Fountain Rd |
| Legal Description | See Addendum |
| City | Joplin |
| County | Jasper |
| State | MO |
| Zip Code | 64801 |
| Census Tract | 0112.00 |
| Map Reference | Area |
| Sale Price | $ N/A |
| Date of Sale | N/A |
| Borrower | Jack M & Kay L Clayton |
| Lender/Client | Southwest Missouri Bank |
| Size (Square Feet) | 2,190 |
| Price per Square Foot | $ 86.75 |
| Location | Suburban/A |
| Age | 33A/15E(rem) |
| Condition | Average |
| Total Rooms | 6 |
| Bedrooms | 3 |
| Baths | 2 |
| Appraiser | Janelle L Choens |
| Date of Appraised Value | 03/04/2010 |
| Opinion of Value | $ 190,000 |

Choens Appraisal Service

Main File No. 119-05410 Page #4

# FIRREA / USPAP ADDENDUM

Borrower/Client Jack M & Kay L Clayton
Property Address 1080 W Fountain Rd
File No. 119-05410
City Joplin County Jasper State MO Zip Code 64801
Lender Southwest Missouri Bank

**Purpose**

The purpose of this appraisal report is to determine an opinion of market value, in terms of cash or on financing terms equivalent to cash, unless otherwise stated herein. The definition of market value can be found under additional comments below.

**Scope of Work**

See Addendum.

**Intended Use / Intended User**

Intended Use: As identified in the Uniform Standards of Professional Appraisal Practice (USPAP), a party receiving a copy of an appraisal report in order to satisfy disclosure requirements does not become an intended user of the appraisal unless the client identified such party as an intended user as part of the appraisal assignment. **The intended use of this appraisal is for repossession purposes only.**

Intended User(s): **The intended user of this appraisal is Southwest Missouri Bank, only.**

**History of Property**

Current listing information: The purpose of this appraisal report is to determine an opinion of market value, in terms of cash or on financing terms equivalent to cash, unless otherwise stated herein. The definition of market value can be found under additional comments below.

Prior sale: **There is no prior sales information available to us at this time.**

**Exposure Time / Marketing Time**

Exposure time may be defined as follows: the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based upon an analysis of past events assuming a competitive and open market. Statement: Reasonable exposure time is one of a series of conditions in most market-value definitions. Exposure time is always presumed to precede the effective date of the appraisal (USPAP).

**Personal (non-realty) Transfers**

**There is no know personal property to transfer in this transaction.**

**Additional Comments**

A current economic definition of market value agreed upon by agencies that regulate federal financial institution in the United States of America is: A type of value, stated as an opinion, that presumes the transfer of a property (i.e. a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal

Comment: Forming an opinion of market value is the purpose of many real property appraisal assignments, particularly when the client's intended use includes more than one intended user. The conditions included in market value definitions establish market perspective for development of the opinion,. These conditions may vary from definition to definition but generally fall into three categories:

1) the relationship, knowledge, and motivation of the parties (i.e., seller and buyer);
2) the terms of the sale (e.g., cash, cash equivalent, or other terms); and
3) the conditions of sale (e.g., exposure in a competitive market for a reasonable time prior to sale). USPAP

**Certification Supplement**

1. This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or an approval of a loan.
2. My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result or the occurrence of a subsequent event.

STATE OF MISSOURI — JANELLE CHOENS 2000157817 — CERTIFIED RESIDENTIAL REAL ESTATE APPRAISER

Appraiser: Janelle L Choens
Signed Date: 03/10/2010
Certification or License #: 2000157817
Certification or License State: MO Expires: 6/30/2010
Effective Date of Appraisal: 03/04/2010

Supervisory Appraiser:
Signed Date:
Certification or License #:
Certification or License State: Expires:
Inspection of Subject: ☐ Did Not ☐ Exterior Only ☐ Interior and Exterior

Choens Appraisal Service

Main File No. 119-05410 Page #7

# Exterior-Only Inspection Residential Appraisal Report

File # 119-05410

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

Property Address 1080 W Fountain Rd City Joplin State MO Zip Code 64801
Borrower Jack M & Kay L Clayton Owner of Public Record Patton, Vincent County Jasper
Legal Description See Addendum
Assessor's Parcel # 16802700000006000 Tax Year 2009 R.E. Taxes $ 1,503.26
Neighborhood Name Joplin Map Reference Area Census Tract 0112.00
Occupant [X] Owner [ ] Tenant [ ] Vacant Special Assessments $ N/A [ ] PUD HOA $ [ ] per year [ ] per month
Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)
Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) Repossession
Lender/Client Southwest Missouri Bank Address 110 N. Neosho Blvd., P.O. Box430, Neosho, MO 64850
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [X] Yes [ ] No
Report data source(s) used, offering price(s), and date(s). Subject was listed for $ 299,500.00 per MLS# 111097 on 08/30/2009 and has been on the market for 253 days; price was reduced to $ 249,900.00 on 01/20/2010.

**CONTRACT**

I [ ] did [X] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. Subject is not for sale. This is not a purchase.

Contract Price $ N/A Date of Contract N/A Is the property seller the owner of public record? [ ] Yes [ ] No Data Source(s) N/A
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid. N/A

**NEIGHBORHOOD**

**Note: Race and the racial composition of the neighborhood are not appraisal factors.**

| Neighborhood Characteristics | | | | One-Unit Housing Trends | | | | One-Unit Housing | | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural | Property Values | [ ] Increasing | [X] Stable | [ ] Declining | PRICE $ (000) | | AGE (yrs) | One-Unit | 50 % |
| Built-Up | [ ] Over 75% | [X] 25-75% | [ ] Under 25% | Demand/Supply | [ ] Shortage | [X] In Balance | [ ] Over Supply | 29 | Low | 0 | 2-4 Unit | % |
| Growth | [ ] Rapid | [X] Stable | [ ] Slow | Marketing Time | [ ] Under 3 mths | [X] 3-6 mths | [ ] Over 6 mths | 250+ | High | 100+ | Multi-Family | % |
| | | | | | | | | 125+ | Pred. | 30+ | Commercial | % |
| | | | | | | | | | | | Other | 50 % |

Neighborhood Boundaries Subject is located South of Fir Rd, North of W Zora, East of N Lone Elm Av and West of N Main Street in Jasper County, Missouri.
Neighborhood Description See attached addenda.

Market Conditions (including support for the above conclusions) There is ample conventional financing available from local lenders. The Joplin metro area services approximately 400,000 residents in the surrounding communities.

**SITE**

Dimensions 9.89 Acres M/L Area 9.89 Acres M/L Shape Rectangular View Neighborhood
Specific Zoning Classification No Zoning Zoning Description No Zoning - Jasper County
Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | [ ] | Water | [ ] | [X] Well | Street Asphalt | [X] | [ ] |
| Gas | [ ] | [ ] N/A | Sanitary Sewer | [ ] | [X] Septic | Alley NA | [ ] | [ ] |

FEMA Special Flood Hazard Area [ ] Yes [X] No FEMA Flood Zone X FEMA Map # 29097C0144D FEMA Map Date 3/16/2006
Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe
There are no noticeable adverse conditions, encroachments, easements or hazardous substances. Please refer to scope of work. Subject may have a street or utility easement and a survey could better determine their existance. Unless furnished with a survey, we rely on title companies, city or county officials, lenders or owners for legal and lot size information.

**IMPROVEMENTS**

Source(s) Used for Physical Characteristics of Property [ ] Appraisal Files [X] MLS [X] Assessment and Tax Records [ ] Prior Inspection [ ] Property Owner
[X] Other (describe) Exterior Inspection from street Data Source for Gross Living Area Courthouse

| General Description | General Description | Heating/Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [ ] Concrete Slab [X] Crawl Space | [X] FWA [ ] HWBB | [X] Fireplace(s) # 1 | [ ] None |
| # of Stories One | [ ] Full Basement [ ] Finished | [ ] Radiant | [ ] Woodstove(s) # | [X] Driveway # of Cars 1 |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | [X] Partial Basement [X] Finished | [ ] Other | [X] Patio/Deck Scr | Driveway Surface Asphalt |
| [X] Existing [ ] Proposed [ ] Under Const. | Exterior Walls Wd/Brk/Stuco/ | Fuel Electric | [X] Porch Covered | [X] Garage # of Cars 2/2 |
| Design (Style) Traditional/A | Roof Surface Comp/A | [X] Central Air Conditioning | [ ] Pool | [X] Carport # of Cars 3 |
| Year Built 1977 | Gutters & Downspouts Alum/A | [ ] Individual | [X] Fence Chain | [X] Attached [X] Detached |
| Effective Age (Yrs) 15 | Window Type Alum/SH/Camt | [ ] Other | [X] Other *Amenities | [ ] Built-in |

Appliances [ ] Refrigerator [ ] Range/Oven [ ] Dishwasher [ ] Disposal [ ] Microwave [ ] Washer/Dryer [ ] Other (describe)
Finished area above grade contains: 6 Rooms 3 Bedrooms 2 Bath(s) 2,190 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.) Subject has a wood burning fireplace in living room. Subject has an above ground pool which is considered personal property and no value has been given.
Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.). The home is considered to be in average condition for it's age. The quality of construction appears to be typical for similar aged homes in subjects area. No unusual functional obsolescence or external inadequacies were observed.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No
If Yes, describe.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe.



Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Exterior-Only Inspection Residential Appraisal Report

File # 119-06410

There are 0 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 135,000 to $ 250,000 .
There are 0 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 135,000 to $ 250,000 .

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1080 W Fountain Rd Joplin, MO 64801 | 12745 County Rd 280 Carl Junction, MO 64804 | | 23915 Hwy 43/Oreo Ln Oronogo, MO 64855 | | 6366 County Ln 286 Carl Junction, MO 64834 | |
| Proximity to Subject | | 8.09 miles N | | 10.80 miles N | | 3.09 miles NW | |
| Sale Price | $ N/A | | $ 146,000 | | $ 174,500 | | $ 225,000 |
| Sale Price/Gross Liv. Area | $ 86.75 sq.ft. | $ 67.59 sq.ft. | | $ 91.84 sq.ft. | | $ 99.91 sq.ft. | |
| Data Source(s) | | MLS# 110107 DOM: 222 | | MLS# 109950 DOM: 69 | | MLS# 112939 DOM: 36 | |
| Verification Source(s) | | Listing Price: $ 149,900. | | Listing Price: $ 178,000. | | Listing Price: $ 265,000. | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | VA CC Paid | -3,200 | Conventional None Noted | | Conventional None Noted | |
| Date of Sale/Time | | 08/30/2009 | | 06/26/2009 | | 11/30/2009 | |
| Location | Suburban/A | Equal | | Equal | | Equal | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 9.89 Acres M/L | 10.0 Acres M/L | | 25.0 Acres M/L | -15,110 | 5.0 Acres M/L | +4,890 |
| View | Neighborhood | Neigh./River | | Neighborhood | | Neighborhood | |
| Design (Style) | Traditional/A | Traditional/A | | Traditional/A | | Traditional/A | |
| Quality of Construction | Wd/Brk/Stuc/A | Hardboard/A | +6,480 | Brick/Vinyl/A | | Vinyl/A | +6,756 |
| Actual Age | 33A/15E(rem) | 51+A/22E(rem) | +9,674 | 31+A/15E | | 1A/0E | -29,233 |
| Condition | Average | Average | | Average | | Average | |
| Above Grade Room Count | Total 6 / Bdrms. 3 / Baths 2 | Total 10 / Bdrms. 3 / Baths 2 | | Total 7 / Bdrms. 3 / Baths 2 | | Total 7 / Bdrms. 3 / Baths 2.5 | -1,000 |
| Gross Living Area | 2,190 sq.ft. | 2,160 sq.ft. | +630 | 1,900 sq.ft. | +6,090 | 2,252 sq.ft. | -1,302 |
| Basement & Finished | 440 Sq. Ft. | N/A | +3,080 | N/A | +3,080 | 1086 Sq. Ft. | -4,522 |
| Rooms Below Grade | 440 Finished | N/A | +3,080 | N/A | +3,080 | 1086 Finished | -4,522 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent H/A | Cent H/A | | Cent H/A | | Cent H/A | |
| Energy Efficient Items | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 2/2 Gar/3CCrpt | 2 Car Garage | +6,000 | 2 Car Garage | +6,000 | C/2C Garage | +4,000 |
| Porch/Patio/Deck | Prch/ScrPat/A | Porch/Deck/A | | Porch/Deck/A | | Prch/Pat/Dk/A | |
| Fireplace, Fence, Pool, Etc. | Fnc/1FP/A | Fnc/1FP/A | | Fnc/1FP/A | | Fnc/1FP/A | |
| Other | WP/OB's/Gst Ar | OB/Shop/A | +16,150 | OB's/Shop/A | +14,150 | WP/SS/Gst A/S | -6,500 |
| Other | N/A | N/A | | N/A | | N/A | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 41,894 | ☒ + ☐ - | $ 17,290 | ☐ + ☒ - | $ -31,433 |
| Adjusted Sale Price of Comparables | | Net Adj. 28.7 % Gross Adj. 33.1 % | $ 187,894 | Net Adj. 9.9 % Gross Adj. 27.2 % | $ 191,790 | Net Adj. 14.0 % Gross Adj. 27.9 % | $ 193,567 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain Sales information is primarily limited to the Multiple Listing Services, courthouse and/or local Realtors information sources.

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) MLS/Courthouse
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) MLS/Courthouse

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | See Below | N/A | N/A | N/A |
| Price of Prior Sale/Transfer | See Below | None Found | None Found | None Found |
| Data Source(s) | See Below | Per MLS | Per MLS | Per MLS |
| Effective Date of Data Source(s) | 03/04/2010 | 03/10/2010 | 03/10/2010 | 03/10/2010 |

Analysis of prior sale or transfer history of the subject property and comparable sales According to the Jasper County Courthouse subject transferred:
09/28/2009 Grantor(s) Kay L Clayton - Grantee(s) Vincent Patton; Bk2145/Pg1839
04/15/2009 Grantor(s) Jack M & Kay L Clayton - Grantee(s) Kay L Clayton; Bk2127/Pg0474
04/15/2009 Grantor(s) Vincent Patton - Grantee(s) Kay Clayton; Bk 2127/Pg 0474
All comparable sales appear to be "arm's length transactions". See above information. Missouri is a non-disclosure state. Sales prices are not recorded as public information through the county assessor.

Summary of Sales Comparison Approach After a thorough search of the subjects marketing area, the comparable sales shown were found to be the best overall recent sales available at this time. Other sales were considered, but they required far more adjustments in various areas, making the adjusted values less reliable. Any adjustments for quality of construction were done so by giving consideration to many different aspects of the quality of materials and workmanship throughout the improvements, rather than just the exterior siding as listed on the grid above. Lot size adjustment is also made by considering many factors, including amount of frontage. A weighted average or linear regression analysis method(s) were utilized in calculating the final opinion of value of this analysis, allowing all sales to contribute to the final site value. See Attached Supplemental Addendum - Sales Comparison Comments. The Sales Comparison Approach, in my opinion, is the best estimation of market value for this property. The Income Approach & Cost Approach have not been used as the appraiser does not consider them meaningful.

Indicated Value by Sales Comparison Approach $ 190,000

Indicated Value by: Sales Comparison Approach $ 190,000 Cost Approach (if developed) $ N/A Income Approach (if developed) $ N/A

Based upon comparable sales utilized within this report, the estimated market exposure time for subject is between 36 and 222days. The opinion of market value is between $ 187,894.00 and $ 193,567.00. The most comparable adjusted sales price being $ 190,000.00. The average exposure time based upon comparable sales is estimated to be 109 days. See Supplemental Addendum.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: This appraisal has been completed "as is". An interior inspection may reveal information that is contrary to what is contained within this report.

**Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 190,000 , as of 03/04/2010 , which is the date of inspection and the effective date of this appraisal.**

# Exterior-Only Inspection Residential Appraisal Report

File # 119-05410

## ADDITIONAL COMMENTS

Although Fannie Mae does not currently require a cost or income approach for its purposes, the appraiser is bound by USPAP (Uniform Standards of Professional Appraisal Practice) which may or may not require a cost or income approach. If the appraiser has determined that a cost or income approach is necessary to produce a credible and reliable market value, then it will be provided within the report and no departure from USPAP is required. If the cost or income approach is not provided as part of the appraisal process, the appraiser has determined that it is not necessary to produce a credible and reliable market value and no departure is necessary.

*subjects amenities include a guest area above detached garage approx. 650 sq. ft.; jetted tub; barn, storage building&shop

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) The estimate of site value has been obtained either through the local multiple listing service; realtors, builders and developers or a combination thereof. In cases where vacant land sales aren't prevalent the extraction method to value may have been utilized.
MLS#103964;MLS#111712;MLS#106194

| | |
|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE =$ 35,000 |
| Source of cost data | DWELLING Sq.Ft. @ $ =$ |
| Quality rating from cost service Effective date of cost data | Sq.Ft. @ $ =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | =$ |
| The appraiser has determined that the cost approach is not necessary to produce a credible and reliable market value and no departure is necessary. | Garage/Carport Sq.Ft. @ $ =$ |
| | Total Estimate of Cost-New =$ |
| | Less Physical / Functional / External |
| | Depreciation =$( ) |
| | Depreciated Cost of Improvements =$ |
| | "As-is" Value of Site Improvements =$ |
| Estimated Remaining Economic Life (HUD and VA only) 45 Years | INDICATED VALUE BY COST APPROACH =$ 35,000 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $ X Gross Rent Multiplier = $ Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

Total number of phases Total number of units Total number of units sold

Total number of units rented Total number of units for sale Data source(s)

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No If Yes, date of conversion

Does the project contain any multi-dwelling units? ☐ Yes ☐ No Data Source(s)

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Main File No. 119-05410 Page #19

# SUPPLEMENTAL REAL ESTATE OWNED APPRAISAL ADDENDUM

Property Address 1080 W Fountain Rd City Joplin State MO Zip Code 64801
Legal Description See Addendum County Jasper
Is the subject property currently listed? ☒ Yes ☐ No Current List Price: $ 249,900 Agent: Kevin Hunter
Listing Company/Address/Phone: Hunter Real Estate LLC (417)659.8448

COMPETING LISTINGS

| ITEM | SUBJECT | LISTING #1 | LISTING #2 | LISTING #3 |
|---|---|---|---|---|
| Address | 1080 W Fountain Rd Joplin, MO 64801 | 3577 W Fountain Rd Joplin, MO 64801 | 5046 W 20th Joplin, MO 64804 | 25955 Kafir Rd Carl Junction, MO 64834 |
| Proximity to Subject | | 1.79 miles W | 5.03 miles SW | 6.09 miles N |
| Original List Price | N/A | 174,900 | 169,000 | 250,000 |
| Current List Price | 249,900 | 169,900 | 164,000 | 250,000 |
| Last Price Revision Date | 01/20/2010 | 02/24/2010 | 06/29/2009 | N/A |
| Days-on-Market | 253 DOM | 61 DOM | 333 DOM | 15 DOM |
| Site/View | Neighborhood | 4.86 Acres/Neighborhood | 2.0 Acres/Neighborhood | 10.0 Acres M/L |
| Design (Style) | Traditional/A | Traditional/A | Traditional/A | Traditional/A |
| Age | 33A/15E(rem) | 45A/15E(rem) | 24A/12E | 32A/15E |
| Condition | Average | Average | Average | Average |
| Above Grade Room Count | Tot: 6 B-rms: 3 Ba: 2 | Tot: 9 B-rms: 3 Ba: 2 | Tot: 6 B-rms: 3 Ba: 2 | Tot: 6 B-rms: 2 Ba: 2.5 |
| Approx. Gross Living Area | 2,190 sq. ft. | 2,500 sq. ft. | 1,500 sq. ft. | 2,056 sq. ft. |
| Basement Area | 440 Sq. Ft. | N/A | N/A | 1600 Sq. Ft./1487Finished |
| Car Storage | 2/2 Gar/3CCrpt | 2 Car Garage | 2C/3C Garage | 2 Car Garage |
| Other (special/financing concessions,amenities,etc.) | Amenities MLS#111097 | Amenities/Eq CH/MLS#114042 | Amenities/Eq CH/MLS# 109839 | Amenities/Superior MLS#114951 |

Describe the value-related differences between the subject property and the competing listings (including financing, terms, conditions, location, appeal, deferred maintenance, utility, style, view, days-on-market, and other amenities). In addition, comment on supply and demand, marketing times, sale-to-list price ratios, REO and new construction activity, and other factors associated with, and/or influenced by, current listings in the subject neighborhood.

Competitive listings are considered to be equal in location and market appeal as to subject. Comparable #1 is inferior to subject in site size, car storage and has not basement; but is superior in square footage. Comparable #2 is inferior in square footage and site size, but superior in age. Comparable #3 is inferior in above grade sq. ft. and garage count; but superior in basement sq. ft. and amenities.

Describe positive and negative factors that affect the marketability and value of properties in the subject subdivision, and specifically the subject property. Discuss current economic trends -- employment, increasing/decreasing property values, supply and demand, and/or seasonal marketing factors.

Current economic trends in subjects neighborhood is that there appears to be an increase in the number of foreclosures in subjects immediate marketing area. The same is true for competitive neighborhoods.

Provide an itemized list of repairs recommended to bring the property into marketable condition. Cost estimates should be based on reliable published cost sources and/or local cost resources. The appraiser is not an expert in the field of building construction and actual costs may vary from those provided. Repair costs and opinions reported herein are subject to future revision based on new repair estimates and evaluations by a licensed building contractor.

| REPAIR ITEM | ESTIMATED COST |
|---|---|
| None Noted | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| TOTAL ESTIMATED COST OF RECOMMENDED REPAIRS | $ |

List any recommended inspections (code compliance, structural, environmental etc.). Provide an explaination why the inspection is recommended, and comment on the affect on marketability and value. When no inspections are recommended, provide a statement to that effect.

There are no known required inspections,however, an interior inspection may reveal information which is contrary to what is contained within this report.

List the number of days-on-market for the comparable sales used in the appraisal report: Comp #1: 222 DOM; Comp #2: 69 DOM; Comp #3: 36 DOM.
Comments: The average days on the market for comparable sales is 109 days and average list/sales ratio is 90%.

In addition to the "AS-IS" market value estimated on the attached appraisal report, which is based on a reasonable market exposure time determined by current market conditions and described in the Neighborhood Section of the report, the following value estimates for the subject are required. Note: The difference between the "AS IS" and "AS-REPAIRED" value should approximate the market's reaction to the needed repairs, not necessarily the dollar-for-dollar cost to place the subject in marketable condition.

"AS-IS" estimate of market value based on a reasonable market exposure time as rendered in the attached appraisal report ........ $ 190,000
"AS-REPAIRED" estimate of market value based on a reasonable market exposure time ........ $
"AS-IS" estimate of market value based on a client-imposed restricted market exposure time of 90 days (not to exceed 120 days) ........ $ 188,500
"AS-REPAIRED" estimate of market value based on a client-imposed restricted market exposure time of ____ days (not to exceed 120 days) ........ $

**APPRAISER:**
Signature [signature]
Name Janelle L. Choens
Date Report Signed 03/10/2010
State Certification # 2000157817 State MO
Or State License # State

[Seal: STATE OF MISSOURI JANELLE CHOENS 2000157817 RESIDENTIAL CERTIFIED REAL ESTATE APPRAISER]

**SUPERVISORY APPRAISER(ONLY IF REQUIRED):**
Signature
Name
Date Report Signed
State Certification # State
Or State License # State

Choens Appraisal Service
Form REO — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE